SUSAN M. CHEHARDY, Judge.
 

 12Lester George appeals his conviction of four counts of armed robbery with a gun, and his sentence as a second-felony offender to fifty-five years at hard labor. We affirm the convictions, but vacate the sentences and remand for resentencing.
 

 
 *674
 
 FACTS
 

 On September 19, 2008, the Jefferson Parish District Attorney filed a bill of information charging Lester George with four counts of violation of La. R.S. 14:64 and La. R.S. 14:64.3, armed robbery with the use of a firearm. George was arraigned on October 1, 2008, and pleaded not guilty.
 
 [1]
 

 The trial court subsequently denied George’s motion to suppress his statement.
 

 After a two-day trial, on May 20, 2009 a 12-person jury found Lester George guilty as charged of four counts of armed robbery using a firearm. On June 3, 2009, George was sentenced to fifty years at hard labor on each count to run concurrently, without benefit of parole, probation, or suspension of sentence.
 

 |sThe State filed a habitual offender bill of information alleging that Lester George is a second-felony offender.
 
 [2]
 
 George initially denied the allegations, but on June 24, 2009 he admitted to being a second felony offender.
 
 [3]
 
 After advising George of his rights and accepting his admission, the trial court vacated the original sentence on count one and sentenced George, as a second felony offender, to fifty-five years at hard labor, concurrent with the sentences imposed for counts two, three, and four. This appeal ensued.
 

 FACTS
 

 On July 29, 2008, at approximately 4:30 p.m., two black males with shirts tied around their heads and bandanas over their faces walked into Loc’s Barber Shop at 2529 Ames Boulevard in Jefferson Parish. Barbers Michael Sumera, II and Damien Vinson were cutting the hair of customers Ralph Breaux and Jeff Barrios when the men came in and robbed them.
 

 With guns in their hands, the perpetrators told them to give up everything they had. While one of the perpetrators pointed a gun at the victims, the other perpetrator went through their pockets and collected their property. The perpetrators took Sumera’s gun, the keys to his truck and house, and his money; Vinson’s car keys, his cardholder containing his license and debit card, his gold chain, and his cash; Barrios’ car keys and his money; and Breaux’s gold chain, phone, car keys, wallet, and cash. Vinson estimated that $800 was taken in all.
 

 The perpetrators forced the victims into the shop’s bathroom and jammed a chair against the door knob. Sumera managed to kick the door open and the victims called the police.
 

 14Penny Thomassie, who owned a barber shop next door to Michael Sumera’s shop, testified she observed two black males run past her shop’s window at 4:35 p.m. She said they ran across Ames Boulevard and
 
 *675
 
 to the right of the canal, through the woods to the Bayou Estates subdivision.
 

 Michael Cangelossi, a resident of Caddy Drive in Bayou Estates, testified he was outside between 4:00 and 4:30 on the day of the robbery. He saw a green Malibu with a missing bumper stop by the dead end of the street to allow two black males to get out. He testified the two black males were wearing white t-shirts and short blue jeans, and they walked into the woods. He also testified that the white driver ultimately parked down the street about a block away after seeing that Can-gelossi was watching. About five to ten minutes later, the driver pulled up quickly to the dead end to allow the two black males to jump back into the car after they came running from the woods. Cangelos-si’s daughter called' the police to report what her father had observed. The police arrived and interviewed Cangelossi.
 

 Vinson testified a detective called and said a green Malibu was seen with people being dropped off. Vinson recalled seeing the green Malibu the weekend before the robbery, when Daniel. Lucas came to get a haircut.
 

 Sumera testified he learned of a description of the car suspected in the robbery, a green Malibu that was missing a bumper, and also recognized the vehicle as a vehicle that was there the weekend before when Lucas came for a haircut. In addition, Sumera said, several days after the robbery he was outside searching for keys or anything that had been taken, when he saw the green Malibu car with the missing bumper pass on Ames Boulevard. He noticed .the occupants in the car were looking back at them. Sumera recognized the driver of the car as [ sDaniel Lucas (whom he knew as “Cryser”), a customer whose hair he had been cutting for years. He believed there were three black males in the car with him.
 

 Sumera and Breaux got into a car and chased the green car. Breaux called the police while Sumera was driving. Sumera stated they tried to pull the car over, but the occupants would not look at them. The car they were chasing got away.
 

 Approximately an hour after the robbery, Lieutenant David Williams of the Jefferson Parish Sheriffs Office observed a vehicle that matched the description of a vehicle he had been requested to look out for. He saw the green Malibu with a missing bumper being driven on the West-bank Expressway, heading towards Ames Boulevard, and learned the vehicle was wanted in connection with an armed robbery. Lieutenant Williams got behind the vehicle, activated his lights and siren, and the ear ultimately pulled into a gas station. Two persons were in the vehicle at this time, a white male driver, Lucas, and á black male passenger, who was later identified as Lester George. He determined that the vehicle belonged to Lucas.
 

 Lieutenant Williams advised the driver to exit the vehicle and told the passenger to remain inside the vehicle. The driver complied and was handcuffed and placed in the rear of a police unit. The police picked up Cangelossi, and brought him to where the car was parked. He identified it as the car he had previously observed.
 

 Detective David Mascaro of the Jefferson Parish Sheriffs Office testified he .arrived on the scene, spoke to Lester George, and advised him of his rights.
 
 [4]
 
 He told George he was the focus of an
 
 *676
 
 armed robbery investigation. Mascaro testified that George acknowledged he understood his rights.
 

 Lucas and George were advised of their Miranda
 
 [5]
 
 rights on the scene and then were transported to the Detective Bureau. Deputy Jesus Falcon of the Jefferson Parish Sheriffs Office testified that he transported George to the bureau and George was read his rights.
 

 Sergeant John Carroll of the Jefferson Parish Sheriffs Office was also involved in the investigation of the robberies. When George arrived at the Detective Bureau, Sergeant Carroll read him his
 
 Miranda
 
 rights at 6:41 p.m., using the standard Jefferson Parish Sheriffs Office Rights of Arrestee or Suspects Form. George originally said his name was Lester Tobias. He indicated he understood his rights and signed the waiver of rights portion of the form, indicating he wished to waive his rights and make a statement. Prior to George’s signing the form, the officers determined that the suspect using the name Lester Tobias was actually named Lester George. George told them he initially gave the last name Tobias because there were attachments out for him.
 

 Sergeant Carroll testified that George was not threatened, forced, or promised anything. He also testified that George did not appear impaired and did not indicate that he was impaired. He testified that George did not appear intoxicated when the waiver of rights form was filled out.
 

 Detective Mascaro took George’s statement at 10:53 p.m. He denied using force, coercion, or intimidation on George for the statement. He also denied making promises to George. Detective Mascaro testified that George did not appear intoxicated or drugged in a fashion that he did not understand what was happening. He testified that George appeared cognizant of all that was going on.
 

 17George later accompanied Sergeant Carroll on a drive through various neighborhoods, pointing out certain things for Sergeant Carroll, including houses. Detective Mascaro testified that George and the car did not smell like marijuana.
 

 An audiotape of George’s statement was played for the jury. In his statement, George acknowledged that Sergeant Carroll went over the form with him and advised him he was under investigation for armed robbery. George admitted he originally said his last name was Tobias and explained he lied about his name because there was an attachment out for him. He stated that he and “Dizzy”
 
 [6]
 
 were dropped off on Caddy Street by the woods. He admitted they went into the barber shop.
 

 George denied he was armed, but said that Dizzy was armed with a pistol and pulled the gun out in the barber shop. He said Dizzy had a black rag and a t-shirt covering his face. George said he was wearing a white shirt and had a t-shirt and a towel around his head. He agreed that it probably covered his face. George said Dizzy told him to go through the pockets of the four people in the barber shop; he admitted they took things from the people. He admitted to taking money, a cell phone, chains, keys, and a gun.
 

 George explained that when they left, they ran across the street and through the woods, along the canal. He said Lucas waited for them with the ear, and while riding in the car George threw keys and a cell phone out by a dumpster. He admitted that each of them got about $200 and
 
 *677
 
 that the $181 in his pocket was what was left of his share. He said they were riding in the car smoking weed and were chased by a car, but they had lost them. He stated that after they dropped Dizzy off, the police pulled them over.
 

 IsKendall Bradley also was arrested for participating in the barber shop robbery on Ames Boulevard. Just prior to George’s trial, Bradley pleaded guilty to robbery; as part of a plea agreement, he received a 30-year sentence. At George’s trial, he testified that Detective Mascaro beat him and hit him in the face to influence him to give his statement. He believed George had received the same treatment. Bradley testified that Lucas, George, and himself were doing heroin prior to the robbery. He testified that after the . robbery, they spent $60 to purchase more heroin, an amount that was enough for three people to get high. He testified they split the robbery money equally, a little over $200 each. Bradley testified he was still high when he went to the police station.
 

 Bradley’s girlfriend consented to a search of her residence, where Bradley sometimes stayed. Nothing was recovered at the time the search was conducted, but Bradley’s girlfriend later contacted Sergeant Carroll and gave him clothes she had found: blue jean shorts, black tennis shoes, and a black bandanna. Police believed these clothes were worn during the robberies.
 

 Daniel Lucas testified he was arrested for the July 29, 2008 robbery of the barber shop. Lucas admitted he had been to this barber shop prior to July 29, 2008. Lucas testified that on this day he was driving á green Malibu with a missing back bumper. George and Bradley were with him. He testified that prior to the robbery, he dropped George and Bradley off on Caddy Drive near the woods. Lucas testified he left the spot where he had dropped them off into the woods because someone was looking at him. He picked them back up when he saw them running from the woods.
 

 Lucas testified he dropped George off to change his shoes, and then they went to the Fisher projects to buy heroin for $80. He believed that everyone had put in for the heroin and that they all snorted the heroin in the vehicle on the way |9back to Caddy Drive to purchase marijuana for $5. Lucas testified he passed the barber shop to see what was going on and the barber saw them and chased the vehicle, but they got away. He testified that a deputy stopped the car after he and George had dropped off Bradley, who took the guns with him. Lucas testified that he received about $150 from the robberies. Lucas believed the robbery yielded over $700. He explained that they had taken money, jewelry, cell phones, and keys. He testified that the cell phones and car keys were thrown out of the window into a dumpster.
 

 Lucas stated he understood the rights of which he was advised. However, Lucas said his judgment was clouded because he was on heroin at the time. Lucas testified that he was arrested about an hour after doing heroin and that he had also smoked marijuana. Lucas testified that he was still high when he signed the rights of arrestee form, but that he understood he was being arrested for armed robbery and that he was waiving his rights for an attorney. Lucas pleaded guilty to conspiracy and was sentenced to five years for his involvement in the robberies.
 

 ASSIGNMENT OF ERROR NUMBER ONE
 

 In his first assignment George argues the trial court erred in denying his motion to suppress his statement because it was not knowingly and voluntarily made due to
 
 *678
 
 his state of intoxication. George argues that before the statement he had snorted heroin and smoked marijuana and, despite this admission in his and his co-defendant’s statements, they were not tested for drugs.
 

 The State responds that other than the claims of George and his co-conspirators, there is no proof that George ingested heroin at any time prior to making his confession. The State acknowledges that no drug tests were performed and no drugs were found. However, the State points out that both Sergeant Carroll and Detective Mascaro testified George seemed coherent and fully aware of the | inconsequences of his decision to waive his rights and to make a statement. They also testified George did not display any characteristics of intoxication.
 

 The State argues that even if George ingested heroin before his confession, George offered no proof to establish his intoxication was significant enough to vitiate the voluntariness of his confession. The State contends George was made fully aware of his constitutional rights, waived his rights, and did not seem impaired or intoxicated. The State asserts he was able to fully comprehend the consequences of waiving his constitutional rights and confessing, and this did not vitiate the volun-tariness of his confession.
 

 March 11, 2009 Suppression Hearing
 

 At the suppression hearing on March 11, 2009, the State presented testimony by Sergeant Carroll and Detective Mascaro testified.
 

 Sergeant Carroll testified he used the Jefferson Parish Rights of Arrestee or Suspect Form and Mirandized George, who initially was using the name “Lester Tabias.”
 
 [7]
 
 Sergeant Carroll said he went over each right with George, and George appeared to understand each right. George initialed the form next to the rights and signed the form, indicating he understood his rights. Sergeant Carroll testified he went over the waiver portion of the form with George and George indicated he understood that portion of the form as well. George signed the form, agreeing to waive his rights. Sergeant Carroll testified no one used force, coercion, or intimidation to get George to acknowledge or waive his rights. He also denied that anyone promised George anything to get George to waive his rights.
 

 Detective Mascaro testified he advised George of the nature of his arrest within five minutes of the arrest. Detective Mas-caro later took George’s statement. Detective Mascaro denied he used force, coercion, or intimidation, and also denied | n making promises to George to get a statement from him. Detective Mascaro said George never asked for a lawyer, and never stated that he wanted to stop his statement. Detective Mascaro explained that George’s statement mentions the rights form, and notes how George originally gave the officers a different name and how his correct last name, “George,” was later added to the rights form. Further, Detective Mascaro testified, neither George nor Bradley appeared intoxicated or drugged in any way. He testified George seemed to understand everything that was going on.
 

 Detective Mascaro believed the robbery occurred around 4:00 p.m. He testified George signed the waiver-of-rights form at 6:41 p.m., and George’s statement was taken at 10:53 p.m. Detective Mascaro acknowledged that the robbery investigation
 
 *679
 
 revealed the perpetrators had bought drugs with the money and items obtained from the robbery, and they had been doing drugs all afternoon. According to Detective Mascaro, George did not indicate to him the amount of drugs he purchased or took. Detective Mascaro said George did not appear to be under the influence when he met with him.
 

 Specifically, Detective Mascaro' stated, “From what I recall and how he was carrying himself, he did not appear to be under the influence, he was, he appeared to comprehend everything I was saying, he was alert. He didn’t appear to be under the influence at all.” Detective Mascaro further testified George was not given a drug test.
 

 After the testimony concluded, defense counsel argued the police report alleged George was using drugs two hours before signing the waiver of rights form, yet George was not tested for drugs. Counsel concluded George was incapable of waiving his rights at the time. After the trial judge questioned counsel | iaabout the evidence of George’s impairment, defense counsel stated there was no evidence because the officers had failed to test George for drugs.
 

 The trial judge denied George’s motion to suppress statement. In oral reasons for the ruling, the judge found the arrestees indicated they understood what was explained to them, they initialed each right on the forms, their initials were clear, and their signatures on the Rights of Arrestee forms are similar to their signatures on other documents at various places in the record. The judge found the signatures indicate no mental or physical impairment. He concluded, “I’ve got nothing whatsoever to convince me here that the statements, that the State did not prove beyond a reasonable doubt that the statements were voluntarily and freely given after complete advice of and understanding of all rights.”
 

 Trial
 

 In determining whether the trial court’s ruling on a defendant’s motion to suppress is correct, an appellate court is not limited to the evidence adduced at the suppression hearing, but may also consider the evidence presented at trial.
 
 State v. Huntley,
 
 08-125, p. 6 (La.App. 5 Cir. 5/27/08), 986 So.2d 792, 796. Sergeant John Carroll and Detective Mascaro testified regarding the taking of George’s statement at trial as well. The testimony of both is substantially similar to their testimony at the suppression hearings.
 

 Sergeant Carroll testified George did not appear impaired. He stated George had not indicated to him that he was impaired from drugs or alcohol. When asked whether George was intoxicated at all when he filled out the waiver of rights form, Sergeant Carroll responded, “None whatsoever.”
 

 Detective Mascaro also testified at trial that George did not seem intoxicated or drugged in a fashion where he did not understand what was going on. He denied George was swaying, and testified George appeared cognizant of all that was going on. Detective Mascaro denied smelling marijuana on George. Detective Mascaro further testified he did not determine George was under the influence of anything.
 

 Deputy Jesus Falcon of the Jefferson Parish Sheriffs Office testified he transported George to the Detective Bureau and he read George his rights after detaining him. He did not recall either the car or George smelling like marijuana.
 

 Bradley admitted he, Lucas, and George were doing heroin on the day of the robbery. Bradley testified that he was still “high” when he arrived at the police sta
 
 *680
 
 tion. Lucas also admitted they all were doing heroin. Lucas testified he did heroin and smoked marijuana prior to being arrested. He stated he understood his rights, but was still high at the time.
 

 Law and Analysis
 

 The State has the burden of affirmatively showing that a confession was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises before it may be admitted into evidence.
 
 State v. Addison,
 
 08-461, p. 11 (La.App. 5 Cir. 2/10/09), 8 So.3d 707, 715,
 
 writ denied,
 
 2009-0589 (La.11/20/09), 25 So.3d 787.
 

 If the statement was made during custodial interrogation, the State must also show that the defendant was advised of his constitutional rights.
 
 Addison,
 
 08-461 at 11, 8 So.3d at 715. Whether a defendant’s purported waiver of
 
 Miranda
 
 rights was voluntary is determined by the totality of the circumstances.
 
 Addison,
 
 08-461 at 11, 8 So.3d at 715.
 

 Intoxication renders a statement involuntary only when the intoxication is of such a degree that it negates the defendant’s comprehension and renders him unconscious of the consequences of what he or she is saying.
 
 Addison,
 
 08-461 at 12, 8 So.3d at 715. Decisions whether the intoxication existed and was of a degree sufficient to vitiate the voluntariness of the defendant’s confession are questions of fact to be determined by the trial court.
 
 Id.
 
 The critical factor in a knowing and intelligent waiver is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement.
 
 Addison,
 
 08-461 at 12, 8 So.3d at 715-16.
 

 Not only in
 
 Addison,
 
 but also in other prior cases, this Court found no error in denial
 
 of
 
 a motion to suppress a statement when a defendant claimed to be under the influence of drugs, where the arresting officer saw no signs of intoxication and there was no showing by the defendant that the alleged intoxicated state was sufficient to vitiate the voluntariness of his statement.
 
 See, e.g., Addison, supra; State v. Scott,
 
 06-134, pp. 11-12 (La.App. 5 Cir. 7/25/06), 939 So.2d 462, 470,
 
 writ denied,
 
 2006-2133 (La.3/30/07), 953 So.2d 61;
 
 State v. Hotard,
 
 03-435 (La.App. 5 Cir. 12/30/03), 864 So.2d 748;
 
 State v. Quest,
 
 00-205 (La.App. 5 Cir. 10/18/00), 772 So.2d 772,
 
 writ denied,
 
 2000-3137 (La.11/2/01), 800 So.2d 866.
 

 “A trial court’s determination on the admissibility and its conclusions on the credibility and weight of the testimony relating to the voluntariness of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence.”
 
 Addison,
 
 08-461 at 12, 8 So.3d at 716. A trial court’s determination on the motion to suppress should not be disturbed on appeal, unless it is clearly wrong.
 
 Id.
 

 In this case, we find no reason to disturb the trial court’s determination as to the voluntariness of George’s statement. Even if George were on drugs and had snorted heroin prior to signing the rights-of-arrestee and waiver-of-rights forms and prior to making a statement, there is no evidence the intoxication was of such a degree to negate George’s comprehension and render him unconscious of the | inconsequences of what he provided in his statement. No drug test confirmed that George was impaired. The testimony
 
 of
 
 Sergeant Carroll and Detective Mascaro was that George appeared to understand his rights and he waived them; he did not appear impaired, under the influence, or drugged; and George appeared to understand all that was happening and was alert.
 

 
 *681
 
 We conclude that even if George was intoxicated and had used drugs prior to his arrest, the testimony and George’s statement establish that George was able to understand the rights explained to him and voluntarily gave the statement. George gave details in his statement that were corroborated, and appeared to have no difficulty responding to the questioning.
 

 Based on the foregoing, we find no merit to this assignment. The trial court did not abuse its discretion by denying George’s motion to suppress the statement.
 

 ASSIGNMENT OF ERROR NUMBER TWO
 

 George argues his 55-year enhanced sentence was constitutionally excessive because it was disproportionate to the crime and his criminal history. He argues that the trial court failed to consider any mitigating circumstances in conformity with La.C.Cr.P. art. 894.1.
 

 George also points out he was 24 years old at the time of sentencing, he was on drugs at the time of the robbery, Bradley and Lucas received more lenient sentences than was imposed on him, his prior convictions were non-violent in nature and were adjudicated on the same day. He contends the judge imposed the sentence because he believed George simply lacked remorse for the crime, and argues the judge instead should have deviated from the mandatory sentence, as allowed in
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993).
 

 The State contends the trial court did not abuse its discretion in sentencing George to 55 years imprisonment. The State points out that despite all the | ^aggravating factors of the case, George’s sentence was about half of the maximum sentence authorized by law. The State asserts George’s sentence was not constitutionally excessive.
 

 A defendant “cannot appeal or seek review of a sentence imposed in conformity with a plea agreement which was set forth in the record at the time of the plea.” La.C.Cr.P. art. 881.2(A)(2). This Court has consistently recognized that Art. 881.2 precludes a defendant from seeking review of an enhanced sentence to which the defendant agreed prior to stipulating to the multiple bill.
 
 State v. Moore,
 
 06-875, p. 15 (La.App. 5 Cir. 4/11/07), 958 So.2d 36, 46;
 
 State v. Goodwin,
 
 05-51, p. 4 (La.App. 5 Cir. 6/28/05), 908 So.2d 56, 58. Because George received a sentence imposed in conformity with a plea agreement that was set forth in the record at the time of the plea, he is barred from challenging his multiple offender sentence as excessive.
 
 See Moore, supra; Goodwin,
 
 05-51 at 5, 908 So.2d at 59.
 

 The waiver-of-rights form reflects that George was to receive a sentence of 55 years imprisonment with the “D.O.C.”
 
 [8]
 
 George was advised during the colloquy that he would be sentenced to 55 years at hard labor, and he was in fact sentenced to 55 years imprisonment at hard labor as a second felony offender.
 

 By means of the waiver of rights form as well as the colloquy, George was advised of his multiple offender rights, including his right to a hearing and to remain silent at the hearing. The form also
 
 *682
 
 indicates that George was not forced, coerced, or threatened to admit the allegations of the multiple bill. Further, the waiver of rights form reflects that George was advised he faced a potential sentencing range of .49/6 to 198 years’ imprisonment.
 

 117George cannot now challenge his agreed-upon sentence, which was imposed in conformity with his plea agreement after he stipulated to being a multiple felony offender. Therefore, we find no merit to this assignment.
 

 ERROR PATENT DISCUSSION
 

 George requests an error patent review.
 
 [9]
 
 We have found several patent errors, but only some of them require correction. We address first the errors that must be corrected, both of which concern sentencing.
 

 Patent Error Regarding Original Sentences
 

 We find that George’s sentences for armed robbery must be vacated because they are indeterminate.
 
 [10]
 

 “Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.” La. R.S. 14:64(A).
 

 When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.
 

 La. R.S. 14:64.8(A).
 

 Thus, armed robbery with a firearm is a more serious form of armed robbery for which the penalty range is effectively 15 to 104 years.
 
 State v. Hall,
 
 43,125, p. 6 (La.App. 2 Cir. 6/4/08), 986 So.2d 863, 868,
 
 writ denied,
 
 2008-1511 (La.3/13/09), 5 So.3d 116.
 

 La. R.S. 14:64.3(A) provides for an additional penalty when the dangerous weapon used in the commission of an armed robbery is a firearm. Subsection (A) states that “the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.” Although the State listed the enhancement in the bill of information and the jury verdict sheet indicates that the jury found George guilty of committing armed robbery with a firearm, the trial judge did not state that he was imposing an additional period of incarceration when imposing George’s 50-year sentences.
 

 We find the sentences indeterminate because the trial judge did not state whether the 50-year sentences included the firearm enhancement. Accordingly, we shall vacate the sentences and remand for resentencing.
 
 See State v. Johnson,
 
 08-1156,
 
 *683
 
 pp. 16-17 (La.App. 5 Cir. 4/28/09), 9 So.3d 1084, 1094,
 
 writ application filed,
 
 2009-1394 (La.6/25/09) (No. 2009-KO-1394);
 
 see also State v. Duncan,
 
 09-232, pp. 13-14 (La.App. 5 Cir. 11/10/09), 28 So.3d 410, 418.
 

 Patent Error Regarding Habitual Offender Sentence
 

 The habitual offender sentence also must be vacated as indeterminate. It is unclear whether the 55-year habitual offender sentence George received as part of the sentencing agreement included the enhanced sentence under La. R.S. 14:64.3. As such, the habitual offender sentence is indeterminate and will be vacated, with the matter being remanded for resentencing.
 
 See Johnson,
 
 08-1156 at 16-17, 9 So.3d at 1094,
 
 citing State v. King,
 
 06-1903, p. 8 (La.10/16/07), 969 So.2d 1228, 1232 (“a defendant convicted of armed robbery and sentenced under the habitual offender law can be sentenced to an additional five years under LSA-R.S. 14:64.3 119when the dangerous weapon used in commission of the armed robbery is a firearm.”).
 

 Accordingly, we vacate the habitual offender sentence and remand for resentenc-ing in accordance with La. R.S. 15:529.1 and 14:64.3, for the trial court to clearly set forth the portion of the sentence enhanced under La. R.S. 14:64.3.
 

 Patent Errors Not Requiring Correction in this Appeal
 

 In addition to the above, there áre other patent errors that we need not correct on this appeal, but which we note as guidance for the trial court:
 

 (1) There are patent errors in the June 3, 2009 commitment regarding the restriction of benefits for George’s armed robbery sentences and in the convictions’ descriptions. The transcript reflects the trial judge ordered that George’s four counts of armed robbery be served without benefit of parole, probation, or suspension of sentence. The commitment, however, does not reflect the restriction of benefits. In addition, the. commitment reflects that George was found guilty of armed robbery under La.. R.S. 14:64, with no mention of La. R.S. 14:64.3.
 

 La. R.S. 14:64(B) provides, “Whoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than ten years and for not more than ninety-nine years, without benefit ' of parole, probation, or suspension of sentence.” Generally, where there is a discrepancy between the minutes and the transcript, the .transcript prevails.
 
 State v. Lynch,
 
 441 So.2d 732, 734 (La.1983). Thus, on resentencing the commitment should reflect the mandatory restriction of benefits, as well as the proper designation of the statute under which he was convicted.
 

 (2) There is a patent error regarding the restriction of benefits as to George’s habitual offender sentence. According to both the transcript and |20the' multiple bill commitment, George’s enhanced sentence was imposed without restriction of benefits. La. R.S. 15:529.1(G) requires that all habitual offender sentences be served without benefit of probation or suspension of sentence.
 

 The restrictions on parole eligibility imposed on habitual offender sentences under La. R.S. 15:529.1 “are those called for in the reference statute.”
 
 State v. Esteen,
 
 01-879, p. 30 (La.App. 5 Cir. 5/15/02), 821 So.2d 60, 79 n. 24,
 
 writ denied,
 
 2002-1540 (La.12/13/02), 831 So.2d 983. La. R.S. 14:64(B), the underlying statute, mandates that the sentence be served without benefit of parole, probation, or suspension of sentence. The additional five-year period under La. R.S. 14:64.3(A) also must be
 
 *684
 
 served without benefit of parole, probation, or suspension of sentence.
 

 Although the trial judge failed to prohibit benefits in imposing George’s enhanced sentence, no corrective action is required because the “without benefits” provision is self-activating. La. R.S. 15:301.1(A);
 
 State v. Williams,
 
 2000-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799;
 
 Esteen,
 
 01-879 at 29, 821 So.2d at 78.
 

 (3) The June 24, 2009 multiple bill commitment does not include George’s habitual offender status. The transcript reflects that George admitted to being a second felony offender and was sentenced as such. The commitment states that George was “sentenced under Multiple Bill statute 15:529.1,” but does not reflect that George was sentenced as a second felony offender. In addition, the multiple bill commitment reflects only that George was found guilty of armed robbery under La. R.S. 14:64, with no mention of La. R.S. 14:64.3. This Court has remanded a similar matter for the trial court to correct the commitment to reflect that George was sentenced as a 12i second felony offender.
 
 See State v. Scott,
 
 08-703, p. 12 (La.App. 5 Cir. 1/27/09), 8 So.3d 658, 666,
 
 writ denied,
 
 2009-0650 (La.12/11/09), 23 So.2d 910.
 

 (4) After imposing George’s original sentences, the trial court properly advised George of the prescriptive period pursuant to La.C.Cr.P. art. 930.8. After George’s original sentence in count one was vacated and George was resentenced as a multiple offender, however, the trial judge failed to advise George verbally of the prescriptive period under La.C.Cr.P. art. 930.8. No corrective action is required, however, because George was properly advised of the prescriptive period by the waiver of rights form.
 
 See
 
 La.C.Cr.P. art. 930.8(C).
 

 (5) The record does not reflect that the jury was sworn in this matter, but no corrective action is required. George has not raised any jury irregularities at trial or on appeal. Where jury irregularities are not raised, consideration of that issue is waived.
 
 State v. Bauman,
 
 08-1169, p. 15 (La.App. 5 Cir. 5/12/09), 15 So.3d 177, 187,
 
 writ application filed,
 
 2009-1533 (La.7/9/09) (No. 2009-KH-1522).
 

 (6) There is a patent error regarding timeliness of George’s appeal. Defense counsel noted an intent to appeal after George was convicted and prior to sentencing. George was sentenced on June 3, 2009. On June 5, 2009, a written motion for appeal was filed, and the appeal was granted on June 26, 2009. On June 24, 2009, George admitted to being a second felony offender and was resentenced on count one as a multiple offender. On July 9, 2009, George filed a
 
 pro se
 
 written motion for appeal. On August 24, 2009, the trial court denied the motion as moot, noting that an appeal was previously granted by the court on June 26, 2009.
 

 ImThe motions for appeal that were filed before imposition of George’s enhanced sentence were premature. Any prematurity was cured, however, by the subsequent resentencing of George as a multiple offender.
 
 See State v. Horton,
 
 09-250, p. 4 n. 1 (La.App. 5 Cir. 10/27/09), 28 So.3d 370, 373 n. 1;
 
 State v. Davis,
 
 07-544, p. 3 (La.App. 5 Cir. 12/27/07), 975 So.2d 60, 63 n. 1,
 
 writ denied,
 
 08-0380 (La.9/19/08), 992 So.2d 952. Further, George filed a subsequent motion for appeal after his multiple offender sentence was imposed, although the motion was not granted.
 

 Hence, no corrective action is necessary.
 

 
 *685
 
 DECREE
 

 For the foregoing reasons, the convictions are affirmed. The sentences on all four counts are vacated and the matter is remanded for resentencing according to law, including clarification of whether George’s sentences include any additional punishment under La. R.S. 14:64.3.
 

 CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING.
 

 [1]
 

 . The bill of information also charged Kendall Bradley and Daniel Lucas with the same four counts. Prior to Lester George's trial, Kendall Bradley accepted a plea bargain in which the State agreed not to multiple-bill him and he received a sentence of thirty years. The day after Lester George's trial concluded, Daniel Lucas pleaded guilty to four counts of conspiracy to commit armed robbery and was sentenced to five years.
 

 [2]
 

 . There are two habitual offender bills of information in the record. Apparently the State filed the multiple bill as a "double bill," although it alleged two predicate convictions in the bill itself. It appears George pleaded guilty to and was sentenced for these two predicate offenses on the same date. It is unclear which predicate was used for the second-felony status on which George based his admission in this case. There appears to be a gap in the transcription when the prosecutor was explaining which predicate conviction was being used for the multiple bill.
 

 [3]
 

 .The waiver of rights form reflects the date as June 24, 2008.
 

 [4]
 

 . The detective’s last name is spelled several ways in the record: "Mascera” in the transcript of the motion hearing; "Mascero” in the trial transcript; "Mascaro” in the minute entry for the second day of trial, May 20, 2009, as well as on various documents entered into evidence. We use the spelling "Mascaro.”
 

 [5]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [6]
 

 . “Dizzy” is Bradley's nickname.
 

 [7]
 

 . Sergeant Carroll testified he subsequently added George’s actual last name to the form, with George’s knowledge.
 

 [8]
 

 . The waiver of rights form states the sentence would be served with the "D.O.C.” and did not specifically state it would be served at hard labor. In
 
 State v. Upchurch,
 
 00-1290 (La.App. 5 Cir. 1/30/01), 783 So.2d 398, this Court determined that while the transcript did not specifically state the sentence was to be served at hard labor, it did sentence defendant to serve the sentence in the Department of Corrections: "Only individuals actually sentenced to death or confinement at hard labor shall be confined to the Department of Corrections. [Citations omitted.]” 00-1290 at 9-10, 783 So.2d at 403.
 

 [9]
 

 . Regardless whether a defendant makes such a request, this Court routinely reviews the record for patent errors, pursuant to La. C.Cr.P. art. 920,
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975), and
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990).
 

 [10]
 

 . The sentence for count one was vacated after defendant was resentenced as a multiple offender. Thus, any patent errors relating to this sentence are moot.
 
 See State v. Smith,
 
 09-100, p. 4 (La.App. 5 Cir. 8/25/09), 20 So.3d 501, 502 n. 2,
 
 writ application filed,
 
 2009-2102 (La.9/25/2009) (No. 2009-K-2102).